## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

| | |
|---|---|
| Christopher Dewayne Bonner, as Heir to the ESTATE OF CHRISTOPHER DEWAYNE MATHIS, | |
|     Plaintiff, | Civil Action No. |
| v. | |
| TIMOTHY WARD, AHMED HOLT, JAVEL JACKSON, TREVONZA BOBBITT, JOHN AND JANE DOES, MARJORIE GLOVER, JOSEPH LEON HALL, CHADRICK MILLIKEN, SHAMBREYASHA A. WILLIAMS, REGINALD JACKSON, AUSTIN KLINGMAN, and LISA SOUTH MENDEZ, all in their Individual Capacities, | |
|     Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Christopher Dewayne Bonner, as Heir to the Estate of Christopher Dewayne Mathis, by and through undersigned counsel, and brings this action pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, (hereinafter, "Section "1983").  Plaintiff alleges that, while Christopher Dewayne Mathis was incarcerated, Defendants violated his constitutional and civil rights by exhibiting deliberate indifference to a substantial risk of harm to his health and safety, resulting in the demise of Christopher Dewayne Mathis, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This action arises under the United States Constitution and the Civil Rights Act pursuant to 42 U.S.C. §§ 1983 and 1988 and the Eighth and Fourteenth Amendments of the United States

Constitution, wherein Plaintiff seeks to redress deprivations suffered by Christopher Dewayne Mathis at the hands of Defendants. Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

2.

At all times relevant herein, all Defendants were acting under the color of Georgia law and violating rights secured by the Eighth and Fourteenth Amendments to the United States Constitution and the laws of the United States of America.

3.

Venue is proper in this judicial district based upon 28 U.S.C. § 1391(b)(1) because all Defendants are residents of Georgia, and at least one Defendant resides within this Division of this District Court.

## PARTIES

4.

Christopher Dewayne Mathis (hereinafter, "Mathis") was a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Mr. Mathis was a inmate at the Georgia State Prison, a facility operated by the Georgia Department of Corrections.  As a result of the incidents underlying the instant action, Mr. Mathis passed this life, intestate, on February 26, 2021.

5.

Upon information and belief, no personal representative has been appointed on behalf of the Estate of Christopher Dewayne Mathis and there are no proceedings pending in a probate court in this or any other state, and Plaintiff Christopher Dewayne Bonner (hereinafter, "Plaintiff"), the only son of Christopher Dewayne Mathis, who is also a citizen of the United States and a resident

of Georgia, is the sole Heir at law of the Estate of Christopher Dewayne Mathis in the closest degree.

6.

Defendant Timothy Ward, in his Individual Capacity as Commissioner of the Georgia Department of Corrections, (hereinafter, "Commissioner Ward") served as the commissioner of the Department of Corrections at all times relevant to this suit. In this role, Commissioner Ward was responsible for managing all of the Department's facilities, including the Georgia State Prison, and he oversaw all subdivisions of the Georgia Department of Corrections and all of its employees. Commissioner Ward may be served with process at the offices of the Georgia State Board of Pardons & Paroles, located at 2 Martin Luther King, Jr. Drive SE, Suite 430, Balcony Level, West Tower, Atlanta, Fulton County, Georgia 30334.

7.

Defendant Ahmed Holt, in his Individual Capacity as Assistant Commissioner over the Facilities Division for the Georgia Department of Corrections, (hereinafter, "Assistant Commissioner Holt") served in this role for the Department of Corrections at all times relevant to this suit. In this role, Assistant Commissioner Holt was responsible for the oversight of all facilities of the Georgia Department of Corrections, including the Georgia State Prison, and to monitor the overall supervision and safety of all the felony offenders within the Department's custody. Assistant Commissioner Holt may be served with process at either 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334 or 300 Patrol Road, Forsyth, Monroe County, Georgia 31029.

8.

Defendant Javel Jackson, Psy.D., in her Individual Capacity as Statewide Mental Health Director for the Georgia Department of Corrections, (hereinafter, "Director Jackson") served in this role for the Department of Corrections at all times relevant to this suit. In this role, Director Jackson was responsible for planning and assisting in the development and implementation of mental health related policies and procedures and for the coordination of all mental health services for all facilities of the Georgia Department of Corrections, including the Georgia State Prison. Director Doe may be served with process at her current place of employment, located at 4360 Chamblee Dunwoody Road, Suite 560, Atlanta, Dekalb County, Georgia 30341.

9.

Defendant Trevonza Bobbitt, in his Individual Capacity as Warden of Georgia State Prison, (hereinafter, "Warden Bobbitt") served as the warden of the Georgia State Prison at all times relevant to this suit. As warden, Defendant Bobbitt was responsible for overseeing and supervising the Georgia State Prison, including the staff, inmates, and pretrial detainees located therein. Warden Bobbitt may be served with process at Calhoun State Prison, located at 27823 Main Street, Morgan, Calhoun County, Georgia 39866.

10.

Defendants John and Jane Doe, in their Individual Capacities as Deputy Wardens and the Mental Health Unit Manager of the Georgia State Prison, (hereinafter, collectively, "Deputy Warden John and Jane Doe") served in these roles for the Department of Corrections at all times relevant to this suit. In these roles, Deputy Warden John and Jane Doe were responsible for overseeing the security, living conditions, and the daily operation of medical, mental health, education, and counseling services at the Georgia State Prison.

11.

Defendant Marjorie Glover, in her Individual Capacity, (hereinafter, "Captain Glover") served as a supervisory correctional officer at the Georgia State Prison at all times relevant to this suit.  As a captain and supervisory correctional officer, Defendant Glover was responsible for overseeing and supervising subordinate employees and correctional officers at the Georgia State Prison, including the staff, inmates, and pretrial detainees located therein. Defendant Glover may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

12.

Defendant Joseph Leon Hall, in his Individual Capacity, (hereinafter, "Defendant Hall") was employed as a correctional officer with the Georgia Department of Corrections.  As a correctional officer, Defendant Hall was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Hall may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

13.

Defendant Chadrick Milliken, in his Individual Capacity, (hereinafter, "Defendant Milliken") was employed as a correctional officer with the Georgia Department of Corrections. As a correctional officer, Defendant Milliken was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Milliken may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

14.

Defendant Shambreyasha A. Williams, in her Individual Capacity, (hereinafter, "Defendant Williams") was employed as a correctional officer with the Georgia Department of Corrections.  As a correctional officer, Defendant Williams was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Williams may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

15.

Defendant Reginald Jackson, in his Individual Capacity, (hereinafter, "Defendant Jackson") was employed as a correctional officer with the Georgia Department of Corrections.  As a correctional officer, Defendant Jackson was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Jackson may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

16.

Defendant Austin Klingman, in his Individual Capacity, (hereinafter, "Defendant Klingman") was employed as a correctional officer with the Georgia Department of Corrections. As a correctional officer, Defendant Klingman was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Klingman may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

17.

Defendant Lisa South Mendez, in her Individual Capacity, (hereinafter, "Defendant Mendez") was employed as a correctional officer with the Georgia Department of Corrections. As a correctional officer, Defendant Mendez was responsible for assisting in the overseeing of inmates and pretrial detainees in custody at the Georgia State Prison, including the provision of emergency medical care to such inmates and pretrial detainees. Defendant Mendez may be served with process at 7 Martin Luther King, Jr. Drive SE, Suite 543, Atlanta, Fulton County, Georgia 30334.

18.

Defendants John and Jane Doe, as described above, are real persons whose names are not yet known to Plaintiff.

19.

Plaintiff is unable to specifically identify Defendants John and Jane Doe because, as a result of the death of Mr. Mathis in the facility at issue, Plaintiff has been prevented from ascertaining Mr. Mathis' eyewitness accounts of, or additional witnesses to, the events that occurred between February 6, 2021 and February 26, 2021, the day of Mr. Mathis' demise, or the individuals involved, and because of the documents that were requested of the Georgia Department of Corrections that have yet to be produced.

20.

On February 18, 2022, and February 20, 2023, respectively, Plaintiff requested all documents pertaining to Mr. Mathis from the Georgia Department of Corrections, pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-70, *et seq.*, that would have enabled Plaintiff to identify all individuals responsible for the acts and omissions alleged herein, including arrest reports, criminal histories, incident reports, booking reports, and internal grievances. While the

Georgia Department of Corrections produced several documents, including incident reports in response to the February 18, 2022 request, it expressly refused to produce any of the supplemental incident reports – which specifically provide a more detailed description of the incidents giving rise to an incident report – for incidents that were under investigation by its Office of Professional Standards.  As of this filing, Plaintiff has yet to receive a response to the February 20, 2023 request, which specifically sought all incident reports and supplemental reports for any incidents between the dates of February 1, 2021 and February 28, 2021, involving Mr. Mathis or the individual responsible for Mr. Mathis' demise and the Georgia Department of Corrections has indicated that it will endeavor to respond to this request by March 3, 2023..

21.

Based in part on the information provided by the Georgia Department of Corrections in response to said requests, Plaintiff was only able to ascertain the identities of the individuals who have been specifically named herein.

22.

Plaintiff will be able to ascertain the specific names of Defendants John and Jane Doe once Plaintiff has the opportunity to engage in discovery, or even a period of limited discovery if ordered for such purpose.

## STATEMENT OF FACTS

23.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 22, as if the same were set forth herein.

24.

At all times relevant to this suit, Mr. Mathis was a 37-year-old man, weighing approximately 125 pounds with a height of five feet and five inches, who was in the custody of the Georgia Department of Corrections at its Georgia State Prison, located in Reidsville, Georgia.

<u>Conditions of Georgia State Prison</u>

25.

Georgia State Prison (hereinafter, "GSP") is a prison facility initially constructed nearly 90 years ago, and which housed approximately 1,400 male inmates prior to the temporary closure of GSP in 2022.

26.

GSP is operated by the Georgia Department of Corrections (hereinafter, "GDC"), which considered GSP a "special mission" facility for the purposes of housing and serving individuals with mental illness or who have otherwise exhibited problematic behaviors. During its most recent operation, more than 50 percent of GSP's population was comprised of individuals who had a mental illness.

27.

The campus of GSP consists of nine buildings, each of which contains four, two-tiered cell blocks with single cells. GDC refers to these 36 subdivisions as "dormitories," of which six dormitories were used by GDC for its "Tier II Program."

28.

During its most recent operation, approximately 300 individuals were housed in Tier II dormitories at GSP.

29.

According to GDC policy, the Tier II Program is described as "Administrative Segregation" in which offenders are placed in this long-term program when they are considered "a threat to the safety of the facility, are leaders in a major disturbance or riot, [have failed] in Tier I, [are] leaders in major disturbance resulting in assault or homicide," or have previously exhibited other dangerous conduct.

30.

The housing units designated for Tier II are contained in GSP's G Building (i.e., G-1, G-2, G-3, and G-4 dormitories) and K Building (i.e., K-1 and K-2 dormitories), and each individually-numbered dormitory contains between 26 and 28 cells.

31.

At times, individuals assigned to the Tier II Program were also placed in GSP's K-3, K-4, and DE dormitories.

32.

At times, GDC assigned offenders, who were not in the Tier II Program, but were still in need of isolation for some other reason, in the G-3 and G-4 dormitories.

33.

All of the cells at GSP, including those designated for Tier II, measure approximately eight feet by ten feet.

34.

GSP's Tier II cells were specifically designed so as to, not only isolate its residents, but to deprive them of sensory stimuli and to restrict their physical movement. For example, each cell

includes a single, narrow window, measuring around eight inches wide, and are covered in both plexiglass and a layer of perforated metal.

35.

Individuals assigned to the Tier II Program spend almost all of their time within their cell, including time for meals, and they spend an average of 23 to 24 hours of each day within their cells. Additionally, depending on which "phase" of the program each participant is in, offenders ostensibly should be permitted between one and three fifteen-minute telephone calls and non-contact visits per month.

36.

GDC rarely allows Tier II inmates to leave their cells, and generally only in order to participate in "recreation" or to bathe. However, in reality, there is not sufficient room in the small, outdoor, steel cages for recreation, and there are also significant issues with the cleanliness and functionality of GSP's shower facilities.

37.

GSP policy provides a minimum amount of recreation time and number of showers that Tier II participants are supposed to be permitted in a given week; although, as a result of extreme levels of understaffing, individuals in Tier II often do not actually receive the requisite amount of recreation or ability to shower.

38.

In its most-recent operation, GSP had a 70% officer vacancy rate, one of the highest levels of all of GDC's facilities. Accordingly, GDC was staffing GSP with less than half of the number of staff that GDC says are needed to operate the facility. GSP's vacancy rate was effectively

higher than 70% as the result of any existing GDC employees who did not report to work on a given day.

39.

GSP's understaffing was most significant on the nights and weekends, and it was not uncommon for individuals housed at the facility to see few, if any, officers within their dormitories after 9:00 pm each evening or on Saturdays and Sundays.

40.

GDC policy requires its correctional officers to conduct rounds in each dormitory in 15- or 30-minute intervals. However, because of the understaffing at GSP, it is not uncommon for the staff to fail to conduct these rounds at all, or if so, only once every five to six hours.

41.

According to media reports, there were a total of at least 87 homicides of inmates or offenders in prisons operated by the Georgia Department of Corrections in the years 2020 and 2021.

42.

Around the same period of time, the understaffing at GSP described above resulted in, or contributed to, several deaths at GSP.

43.

Specifically, on April 21, 2020, Raul Bailon Garcia was assaulted by another offender in the Tier II G-2 dormitory, which resulted in his death due to positional asphyxia and suffocation. When GSP staff removed Mr. Garcia's remains from his cell, his body was covered in blood.

44.

While the cause of his death is unknown, Al Mapp, an inmate housed in K-2, a Tier II dormitory, was found dead in his cell on September 11, 2020.  The prior day, another inmate in the same dormitory had called out to Mr. Mapp, but he did not respond.  Correctional officers did not happen to find Mr. Mapp's body until the following day when they arrived in the dormitory to take individuals to the showers.

45.

On November 4, 2020, Joctavious Artez Newsome died after he was stabbed by another offender in the custody of Georgia State Prison; although, it is not clear whether he was being housed in a Tier II dormitory at the time.

46.

On November 23, 2020, in Tier II dormitory G-3, Brandon Peters was found dead in his cell.  In the week leading to his death, Mr. Peters had been asking GSP staff for medical attention because he had been vomiting blood and also had blood in his stool.  Mr. Peters did not receive this medical attention he requested before he was found dead.

47.

Demetrius Stubbins was also killed on December 21, 2020, after he was stabbed in the chest by anther offender; although, again, it is not clear where Mr. Stubbins was housed at the time.

48.

After Mr. Mathis' death in February 2021, as discussed below, several other inmates at GSP experienced similar fates.  On May 5, 2021, Calvin Lewis was found dead in his cell the morning after a pipe burst and flooded his cell, and the officer on duty that morning noted that he

had observed the flood, but that he would not be entering any dorms unless given specific orders to do so since he was single-handedly responsible for securing two different buildings that day. Notwithstanding the flood, Mr. Lewis' body was covered in cuts and gashes.   On May 25, 2021, Christopher Ward died after he lit a fire in his cell after he was denied food, a correctional officer observed smoke but did not respond to the smoke or apparent fire, and Mr. Ward was later found dead on the floor of his cell.  At the time of their respective deaths, Mr. Lewis and Mr. Ward were being housed the K-2 Tier II dormitory.

49.

Additionally, two other individuals in the custody of GSP, Fabian Garcia-Mata and Troy Harvey, were stabbed and killed by fellow offenders in September 2021; although, it is unclear whether they were housed in Tier II dormitories at the time of their deaths.

50.

Regardless of whether a cell has a single- or double-bunk, being confined for an average of 22 hours per day is generally considered "solitary confinement" by recognized corrections and medical experts in the United States and internationally.

51.

GDC's use of solitary confinement at GSP and other facilities causes a substantial risk of serious harm, and it deprives individuals of basic human needs.

52.

Because of the physical and mental health effects of solitary confinement, it has historically been used, generally, as a torture technique.

53.

Solitary confinement for indefinite periods violates contemporary standards of decency and is inconsistent with the opinions of correctional experts, and it has been condemned by organizations such as the Association of State Correctional Administrators, an organization for which Commissioner Ward belonged during his tenure as Commissioner of GDC.

54.

For similar reasons, state and federal law contains certain restrictions on the use of solitary confinement, and it is a practice that has been condemned by the United Nations.

55.

However, as alleged herein, GDC continues to utilize solitary confinement at its facilities, including during the times at issue in this litigation at GSP.

56.

Being subjected to solitary confinement, and especially because of the social isolation it causes, has the propensity of causing or exacerbating hypertension, stroke, diabetes, and cardiac diseases, and it generally reduces a person's life expectancy. Such confinement also impacts a person's mental and behavioral health, including possible cognitive decline, decreased impulse control, feelings like a person is "losing it" or breaking down, irritability, chronic depression and hopelessness, hallucinations, and suicidal ideation.

57.

In addition to the deaths described herein, it is believed that there were at least 12 other individuals who lost their lives due to suicide while being housed at GSP between September 2019 and May 2021.

58.

GDC, including each of the Defendants, have long been on notice that people experience psychiatric decompensation as a result of GSP's conditions and the isolation for which many are subjected, and Defendants have also been on notice that inmates routinely engage in self-harm, suicidal behaviors, and violent and deadly acts against others because of these conditions and isolation.

59.

Decompensation is the deterioration of cognitive or emotional functionality in a person who is distressed or who suffers from a psychological disorder.

60.

While solitary confinement has the potential of causing any individual psychological distress who is subjected to such confinement, the negative consequences of this practice are greater for individuals with preexisting psychiatric conditions.

61.

In the year 2019, 204 of the 281 men assigned to GSP's Tier II Program (i.e., 73%) were designated as "Mental Health Level II" patients, meaning that their mental health function had already been impaired by mental illness, or they had exhibited conduct requiring increased monitoring such as suicidal ideation, self-injurious behavior, or crisis unit placement.

62.

As discussed further herein, GDC policy requires individuals in the custody of GSP with serious mental illness to receive adequate health services, including visits with a mental health counselor and/or psychopharmacological treatment.

63.

However, the individuals housed in GSP's segregation units are often not provided with the requisite or necessary mental health services or treatment.

64.

Offenders often do not have the opportunity to see or speak with a psychiatrist or other mental health professional, especially other than the initial evaluations or consultations in GDC's Acute Care Unit.

65.

Additionally, it is not uncommon for individuals at GSP who have long been prescribed and taking mental health medications to be deprived of the drugs they need while in this facility's custody, many times for months on end.

66.

In its most recent years of operation, half of GSP's mental health counselor positions have been unfilled.

67.

For the mental health counselors who are assigned at GSP, they rarely have interactions with the inmates they are supposed to and have a duty to serve and treat, and when they do, such encounters are often only brief check-ins at the door of each such individual's cell.

68.

The only location in which GDC purportedly provides consistent mental health treatment is in the D-West building and its DW-2 dormitory. The DW-2 dormitory, which includes thirteen, single-person cells and a shower – none of which contain mattresses, sheets, or blankets for the

metal bunks – is known to have deplorable conditions.  GDC uses the DW-2 dormitory as its Acute Care Unit.

69.

As discussed further below, the Acute Care Unit (hereinafter, "ACU") is intended to be the designated location to house inmates who are in need of psychiatric care as the result of expressing suicidal ideation, attempting suicide, or engage in other self-injurious behavior.  However, individuals in GSP's ACU are often left unsupervised by staff and unattended by mental health professionals for extended periods of time.

70.

All of the aforementioned conditions in GSP's solitary confinement units have been approved by Defendants Commissioner Ward, Assistant Commissioner Holt, and Director Jackson, and these units continue to be controlled by the policies and procedures that said Defendants have designed and/or approved.

71.

GDC's policies and procedures concerning the operation of GSP's solitary confinement units are implemented by or under the direct supervision of Defendants Warden Bobbitt, Deputy Warden John and Jane Doe, and Captain Glover.

72.

Because GSP's solitary confinement units are so tightly controlled at all levels of GDC management, Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, Deputy Warden John and Jane Doe, and Captain Glover are all subjectively aware of the conditions of these units at GSP, as alleged herein.  As a result, the aforementioned

Defendants are also subjectively aware of, and responsible for, the harm caused by these conditions.

73.

The conditions of GSP's solitary confinement units, as well as the resultant harm, should also be obvious to any reasonable third-party observer.

74.

Defendants Warden Bobbitt, Deputy Warden John and Jane Doe, Captain Glover, Hall, Milliken, Williams, Jackson, Klingman, and Mendez all had actual knowledge of the conditions and resultant harm alleged herein of GSP's solitary confinement units. Specifically, each of these Defendants is or was assigned to work at this facility at all relevant to this action, and these Defendants have observed and been advised of both the conditions therein and resultant harm.

75.

GDC has also been warned by numerous third-parties that the individuals in GSP's Tier II Program or other solitary confinement units do not receive enough time outside of their cells, as well as the potential impacts that this may cause.

76.

For example, Dr. Jeffrey Metzner, a psychiatrist with over 40 years of experience in forensic psychiatry, had a contract with GDC to provide annual audits concerning the provision of mental health services at various GDC facilities. In an April 2019 letter addressed to Commissioner Ward, Dr. Metzner advised that GDC's Standard Operating Procedures were not being followed in its Tier programs, including the amount of time inmates should be allowed for recreation.

77.

GDC's Office of Professional Standards evaluated GSP's operations and issued a report in November 2019, with contained similar conclusions as the report from Dr. Metzner.

78.

In the same 2019 report, Dr. Metzner warned Commissioner Ward that the "institutional culture" at GSP was "very problematic from the prospective of facilitating the provision of adequate mental health services." Dr. Metzner also explained that vacancies in mental health positions at GSP was inhibiting the provision of those services.

79.

There were several additional internal audits performed by GDC in 2018. A 2018 audit by GDC Office of Professional Standards raised multiple "areas of concern" regarding GSP's provision of mental health care, including that GDC provided "no out of cell individual contact by Mental Health Counselors for Tier II offenders." In another report, GDC's Office of Health Services found that GSP was only 65% compliant with GDC standards for developing mental health treatment plans, and the report urged that a remedial plan must be developed because of the concern that the lack of services could lead to decompensation, suicides, and other self-harm. The Office of Health Services report also warned that these deficiencies placed GDC in "possible legal jeopardy."

80.

In a September 2018 Annual Assessment, GDC's Office of Professional Standards noted that counselors for GSP's Tier programs routinely "copy-pasted" notes about mental health status checks, and that corrections officers were failing to conduct the required 30-minute rounds in the segregation dorms.

81.

In its 2019-2020 Audit Report, which was addressed directly to Warden Bobbitt and GSP's Mental Health Unit Manager, GDC's Office of Professional Standards advised that staffing shortages were limiting the provision of effective mental health services at GSP.

82.

The Southern Center for Human Rights specifically advised GDC of many of these concerns. A May 21, 2020 letter explained that GDC's Tier II Program housing at GSP had fallen below constitutional standards.  In response, GDC merely stated that it would research the allegations and remedy any problems.  A September 18, 2020 letter advised GDC of the increase in suicides in the Tier II units.  GDC apparently did not respond.  An October 28, 2020 letter advised GDC of a specific individual who was being repeatedly tortured by other offenders. In its response, GDC refused to discuss the housing assignments of specific individuals.  According to the Southern Center for Human Rights, they send several more similar letters to GDC since October 2020.

83.

During the same period of time, there have been a number of civil actions filed, alleging violations of inmates constitutional and civil rights, pertaining to conditions at GDC facilities, including GSP.

84.

During the same period of time, there were numerous articles and stories published by media outlets concerning many of the recent deaths at GDC facilities and the conditions therein, with many references to GSP.

85.

As the result of many of the incidents described herein, the United States Department of Justice announced in September 2021 that it was opening a civil rights investigation into GDC's facilities, with a specific focus on the harms that inmates face from other prisoners.

86.

However, the conditions of GSP, particularly with regard to the Tier II Program housing, went largely unchanged until GSP was temporarily closed since 2022.

Mathis' Confinement and Death at Georgia State Prison

87.

In the Spring of 2011, Mr. Mathis was found guilty of the offense of robbery by force, in which Elizabeth Robinson had been identified as the victim.

88.

As a result of this conviction, Mr. Mathis was sentenced to serve a period of twenty years of incarceration, with his final two years being on probation.

89.

After Mr. Mathis' 2011 conviction, he entered into the custody of the Georgia Department of Corrections where he remained until the date of his death on February 26, 2021.

90.

At some point in or before 2019, Mr. Mathis was transferred into the custody of the Georgia State Prison.

91.

Between the time that Mr. Mathis arrived at GSP until his death in February 2021, Mr. Mathis had several encounters in which GSP staff noted concerns about Mr. Mathis' mental health, and GSP staff reported this information to Warden Bobbitt.

92.

On September 14, 2020, Mr. Mathis was assaulted by another offender in GSP's B-2 dorm. After the multiple puncture wounds that Mr. Mathis sustained were checked, Mr. Mathis declined to make a statement about what occurred. As a result, GSP staff took Mr. Mathis to the Tier II G-2 dormitory and placed Mr. Mathis into a holding pen. However, GDC did not investigate this incident further, and Warden Bobbitt did not even review the facts of what occurred until nearly two months later.

93.

For reasons that remain unknown, even though the September 14, 2020 Incident and Supplemental Reports describe the puncture wounds that Mr. Mathis sustained, these Reports say that Mr. Mathis had not been injured at that time.

94.

On February 6, 2021, Mr. Mathis had another encounter with correctional officers.

95.

Specifically, while Captain Glover was escorting another offender back to the F-1 dormitory, where Mr. Mathis was being housed at the time, she observed Mr. Mathis purportedly attempting to leave from the security door of the F-1 dormitory. As previously alleged, the F-1 dormitory is not designated as a unit for the Tier II Program.

96.

Captain Glover states that she instructed Mr. Mathis to return to the F-1 dormitory, but Mr. Mathis refused to comply with her instruction.

97.

As a result, Captain Glover used her two-way radio to call for backup and a pair of restraints or handcuffs.

98.

After Captain Glover made this call on the radio, Defendants Hall, Milliken, and Williams arrived on scene.

99.

According to Captain Glover, as Defendants Hall and Milliken attempted to place Mr. Mathis back into his assigned dormitory, Mr. Mathis became combative and attempted to swing at Defendant Hall while they attempted to place Mr. Mathis into restraints.  Defendant Hall then used hands-on-force to gain positive control of Mr. Mathis.

100.

During this encounter, Mr. Mathis told Defendants Captain Glover, Hall, Milliken, and Williams why he had attempted to leave the F-1 dormitory.  Mr. Mathis explained that his actions had been the result of threats that Mr. Mathis had learned had been made against his own life from other offenders within his dormitory.

101.

According to Captain Glover's report, the February 6, 2021 encounter with Mr. Mathis was not captured on video tape, even though it apparently occurred in either a common area of GSP or, specifically, the F-1 dormitory.

102.

When Mr. Mathis expressed the fears he had for his safety on February 6, 2021, all Defendants were aware that Mr. Mathis had been attacked by another inmate merely a few months earlier.

103.

Mr. Mathis had also had recent communications with members of his family, and Mr. Mathis had advised his relatives that, on several occasions, a relative of Ms. Robinson, the victim of the incident underlying Mr. Mathis' conviction, was employed in the food services department of GSP.

104.

Mr. Mathis also told his relatives that he had become aware of efforts that the same individual had taken in an effort to try to pay an offender to kill Mr. Mathis because of the incident involving Ms. Robinson and resulting in Mr. Mathis' conviction.

105.

Mr. Mathis also told his relatives that he had made several attempts and requests to transfer to another unit, citing the threats to his life, but that Mr. Mathis' attempts to transfer had all been ignored or denied by GSP officials.

106.

As a result of what Mr. Mathis told Defendants Captain Glover, Hall, Milliken, and Williams about his fear for his safety during the February 6, 2021 encounter, Defendants Captain Glover, Hall, Milliken, and Williams had Mr. Mathis escorted to the medical and mental health unit of the facility.

107.

In accordance with its Standard Operating Procedure 508.23, the Georgia Department of Corrections placed Mr. Mathis in its Acute Care Unit, and Mr. Mathis was transferred to the D-West building at the same facility.

108.

In accordance with its Standard Operating Procedure 508.23, the Georgia State Prison mental health staff presumably recommended to Warden Bobbitt that Mr. Mathis be placed in one of Defendant's Specialized Mental Health Treatment Unit ("SMHTU") programs.

109.

In accordance with its Standard Operating Procedure 508.23, within seven (7) days of Warden Bobbitt's review and approval of the mental health staff's recommendations, Warden Bobbitt presumably forwarded the recommendations to GDC's Statewide Mental Health Director, Director Jackson.

110.

In accordance with its Standard Operating Procedure 508.23, within seven (7) days of Director Jackson's review and approval of the mental health staff's recommendations, Director Jackson presumably forwarded the recommendations to GDC's head of the Facilities Division, Assistant Commissioner Holt.

111.

Because Mr. Mathis was moved into the Acute Care Unit, it would appear that Assistant Commissioner Holt reviewed and approved the recommendations.  However, in the event that he denied the placement recommendation, then in accordance with Standard Operating Procedure

508.23, GDC should have a copy of Assistant Commissioner Holt's written justifications for denying the recommendation.

112.

However, while Mr. Mathis was reassigned, Defendants failed to comply with Standard Operating Procedure 508.23, which requires offenders assigned to a SMHTU program be placed in a single occupancy cell, unless specific justification for double-bunking has been provided by representatives of the SMHTU and security staff.

113.

As is apparent from the circumstances involved in his subsequent death, Defendants clearly placed Mr. Mathis into a cell with a double-bunk and a cellmate.

114.

In addition to reviewing the mental health staff's recommendations, Warden Bobbitt reviewed the Supplemental Report prepared by Captain Glover, which, in part, expressly noted the concerns that Mr. Mathis had for his safety and life at the hands of another offender.

115.

However, Defendants failed to address or take any actions regarding the concerns that Mr. Mathis raised about his safety due to threats from other offenders, and Defendants refused to grant Mr. Mathis' requests to transfer to a different facility or cell away from the other offenders who presented an ongoing threat to Mr. Mathis.

116.

Instead of a transfer, Mr. Mathis was then assigned to a cell in the G-3 unit of GSP. As alleged herein, the G-2 dormitory was designated for individuals in the Tier II Program.

117.

When Mr. Mathis was moved to the G-3 dormitory, he was double-bunked with Semaj Lyquell Johnson (hereinafter, "Johnson").  At that time, Mr. Johnson was around 23 years of age, and he weighed approximately 170 pounds, and Mr. Johnson was serving time due to his convictions for several felony offenses, including violent crimes like aggravated assault, armed robbery, and possession of a firearm.

118.

As a result of Mr. Johnson's assignment to the Tier II G-2 dormitory, Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, and Deputy Warden John and Jane Doe had apparently determined that Mr. Johnson had: 1) a serious and persistent mental illness; 2) a severe personality disorder; 3) dementia and/or a traumatic brain injury; 4) severe impulse control disorder; 5) cognitive delays/deficits; or, 6) exhibited violent behavior and mental illness.

119.

Around the same time, six GSP employees including one unit manager and two supervisors, were arrested for a use-of-force incident following an inmate assault on another corrections officer on the afternoon of February 16, 2021.  This incident did not involve Mr. Mathis.

120.

At some point between 6:00 pm on February 25, 2021 and 6:00 am on February 26, 2021, while Mr. Mathis was still asleep in his assigned bunk, Mr. Johnson violently attacked Mr. Mathis.

121.

At the time Mr. Mathis was attacked, there were no correctional officers in the immediate vicinity or observing the unit in question.

122.

Based on Mr. Mathis' ultimate cause of death, Mr. Johnson apparently forced Mr. Mathis' head repeatedly against a dull, firm surface or object, resulting in blunt force trauma to Mr. Mathis' skull.

123.

Several other offenders who were housed in the same area of the dormitory where Mr. Mathis was assigned witnessed Mr. Johnson's assault of Mr. Mathis.

124.

Additionally, as the result of significant number of mobile devices that had been smuggled into the facility, portions of the attack and aftermath were not only recorded on video, but at least one of those videos was subsequently posted on social media.

125.

However, GDC has indicated that it did not capture a video recording of this incident.

126.

Several of the individuals who witnessed Mr. Mathis being attacked later told members of his family that they also observed Mr. Mathis being stabbed, that he was raped, and that an offender other that Mr. Jackson had been able to enter Mr. Mathis' cell around the time of the attack.

127.

None of GDC's employees responded immediately after the attack. Instead, Defendants Jackson, Klingman, and Mendez reported to Mr. Mathis' cell at approximately 7:30 am.

128.

Mr. Mathis was pronounced dead at 7:50 am on February 26, 2021.

129.

Upon information and belief, Warden Bobbitt failed to authorize the cleanup or removal of Mr. Mathis' body before the scene was disturbed by Defendants Jackson, Klingman, and Mendez.

130.

Upon information and belief, Warden Bobbitt allowed Defendants Jackson, Klingman, and Mendez to leave the facility before Warden Bobbitt received a written report with statements from Defendants Jackson, Klingman, and Mendez, contrary to GDC's Standard Operating Procedure 208.03.

131.

An individual in custody who observed Defendants Jackson, Klingman, and Mendez respond to the scene also captured this encounter on video. While it is unclear, particularly without the benefit of discovery, whether Mr. Mathis was deceased at the time, it would appear from the video that Defendant Klingman used his foot to kick an unresponsive Mathis in the head during that time.

132.

Warden Bobbitt also failed to properly notify Mr. Mathis' Next of Kin pursuant to GDC's Standard Operating Procedure 208.03.

133.

After an autopsy was purportedly performed, the funeral home ultimately had to secure parts of Mr. Mathis' scalp and/or skull together using metal wire, and a hat had to be placed on Mr. Mathis' head while his body lay in a casket due to the severity of his injuries.

134.

The Georgia Department of Corrections routinely issues press releases announcing investigations into the death of offenders.

135.

However, it does not appear that such a press release was ever issued regarding the death of Mr. Mathis, and it is unclear whether GDC actually investigated the death.

136.

While offenders were able to capture video recordings of the attack on Mr. Mathis and subsequent events, according to GDC records, as with the February 6, 2021 encounter with Mr. Mathis, the incidents resulting in his death were also not recorded.

137.

Mr. Johnson was subsequently charged with felony murder, malice murder, aggravated assault, and unlawful acts of violence in a penal institution as a result of the homicide of Mr. Mathis.

138.

Warden Bobbitt continued to serve in that capacity until Georgia State Prison was closed in 2022, after which time he was reassigned to be the warden of Calhoun State Prison.

Procedural Background

139.

Since the events underlying this litigation resulted in the death of Mr. Mathis while he was incarcerated, there have not been any administrative remedies available to Plaintiff, and were therefore not required. *See* 42 U.S.C. § 1997e(a).

140.

Notwithstanding the applicability of the statute, Plaintiff served notice of the claims alleged herein, along with all of the necessary elements, on the Georgia Department of Administrative Services and Georgia Department of Corrections via statutory overnight delivery. O.C.G.A. § 50-21-26.

**COUNT I:**
**CRUEL AND UNUSUAL PUNISHMENT**
**IN VIOLATION OF THE EIGHTH AMENDMENT**
**(All Defendants)**

141.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 140, as if the same were set forth herein.

142.

As alleged herein, the totality of the conditions within the Georgia State Prison's Tier II Program and similar segregation units constitutes cruel and unusual punishment.

143.

Defendants Commissioner Ward,  Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, and Deputy Warden John and Jane Doe had, at all times relevant to this action, final authority over each person's confinement in the Georgia State Prison's Tier II Program and other segregation housing units.  These Defendants also had the authority to prescribe the conditions of confinement, including the duration and degree of isolation imposed.

144.

Defendants Warden Bobbitt, Deputy Warden John and Jane Doe, Captain Glover, Hall, Milliken, Williams, Reginald Jackson, Klingman, and Mendez had, at all times relevant to this action, direct control over the conditions of confinement in the Georgia State Prison's Tier II

Program and other segregation housing units, including the duration and degree of isolation imposed.

145.

Prolonged or indefinite solitary confinement is considered torture by many authorities and violates contemporary standards of decency in the United States and many other countries.

146.

Prolonged or indefinite solitary confinement deprives people of basic human needs, including exercise, social interaction, and sensory stimulation. These deprivations are processed by the nervous system as pain.

147.

Prolonged or indefinite solitary confinement creates a substantial risk of serious harm. These potential harms include mental illness, brain dysfunction, self-mutilation, suicide, hypertension, and heart problems. The effects continue long after a person is released from confinement and may be irreversible.

148.

Additionally, forcing individuals to endure unsanitary conditions in their housing units violates contemporary standards of decency and creates a substantial risk of serious harm.

149.

By isolating Mr. Mathis and others in unsanitary conditions in the Georgia State Prison's Tier II Program and other segregated housing units and by failing to take action to alleviate the conditions there, Defendants have violated contemporary standards of decency and have deprived people of basic human needs.

150.

Accordingly, Defendant's actions, as alleged herein, violate the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Due Process Clause of the Fourteenth Amendment.

151.

Before his death, Defendants caused Mr. Mathis injuries to his person by forcing him to endure the conditions alleged herein.

152.

Additionally, Defendants caused Mr. Mathis to suffer additional injuries by forcing other individuals in custody to endure the same conditions, which created the conditions possible for a third-party to take the life of Mr. Mathis.

153.

Pursuant to 42 U.S.C. § 1983, Plaintiff, on behalf of Mr. Mathis, is entitled to all damages available to him as a result of Mr. Mathis being subjected to cruel and unusual punishment by Defendants, all in an amount to be proven at trial.

**COUNT II:**
**DELIBERATE INDIFFERENCE DUE TO FAILURE TO HIRE**
**IN VIOLATION OF THE EIGHTH AMENDMENT**
**(Defendants Ward, Holt, Jackson, and Bobbitt)**

154.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 140, as if the same were set forth herein.

155.

The Eighth and Fourteenth Amendments imposed duties on Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt to take reasonable

measure to guarantee the safety of individuals within their custody, including Mr. Mathis, and to protect them from violence at the hands of other inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).

### 156.

The aforementioned rights to the guarantee of safety while in custody had been secured under the law at all times relevant to this action.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).

### 157.

The aforementioned rights to the guarantee of safety while in custody had been clearly established at all times that Mr. Mathis was incarcerated with the Georgia Department of Corrections.

### 158.

As alleged herein, Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt actually and subjectively knew that Mr. Mathis, and others housed in the Georgia State Prison's Tier II Program and other segregation units, faced a substantial risk of serious harm in the form of injury or death at the hands of other inmates because of the levels of staffing and supervision, or lack thereof, at Georgia State Prison.

### 159.

Despite this knowledge, Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt failed to respond in an objectively reasonable manner to the substantial risk of harm faced by Mr. Mathis, and others housed in the Georgia State Prison's Tier II Program and other segregation units.  For example, these Defendants failed to ensure that the facilities at issue had adequate levels of staffing and supervision.

160.

There was an obvious need to ensure that Georgia State Prison's Tier II Program and other segregation units were staffed and supervised at adequate and necessary levels.

161.

Even if the need to provide adequate and necessarily levels of staffing and supervision in the facilities at issue were not obvious, a pattern of constitutional violations for which the Georgia Department of Corrections and third-parties had all identified, as well as numerous civil actions, put Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt on specific notice of the need to ensure adequate and necessary levels of staffing and supervision in these facilities.

162.

As alleged herein, as a specific result of said Defendants' failure to hire a sufficient number of employees to ensure adequate and necessary levels of staffing and supervision, the unit in which Mr. Mathis was house was understaffed and appropriately monitored, and created the conditions under which Mr. Mathis ultimately lost his life.

163.

Pursuant to 42 U.S.C. § 1983, Plaintiff, on behalf of Mr. Mathis, is entitled to all damages available to him as a result of the deliberate indifference to the health and safety of Mr. Mathis because of the failure to hire for which Defendants Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt were responsible, all in an amount to be proven at trial.

**COUNT III:**
**DELIBERATE INDIFFERENCE DUE TO FAILURE TO PROTECT**
**IN VIOLATION OF THE EIGHTH AMENDMENT**
**(All Defendants)**

164.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 140, as if the same were set forth herein.

165.

The Eighth and Fourteenth Amendments imposed duties on all of the Defendants named herein to take reasonable measure to guarantee the safety of individuals within their custody, including Mr. Mathis, and to protect them from violence at the hands of other inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).

166.

The aforementioned rights to the guarantee of safety while in custody had been secured under the law at all times relevant to this action. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).

167.

The aforementioned rights to the guarantee of safety while in custody had been clearly established at all times while Mr. Mathis was incarcerated with the Georgia Department of Corrections.

168.

As alleged herein, Defendants actually and subjectively knew that Mr. Mathis faced a substantial risk of serious harm in the form of injury or death at the hands of another inmate.

169.

Defendants were specifically aware that Mr. Mathis had been assaulted and stabbed by another offender on or about September 14, 2020.

170.

Defendants were specifically aware that Mr. Mathis had attempted to leave the dormitory where he was assigned, without permission, on February 6, 2021, as a direct result of Mr. Mathis having learned about threats to his safety and life at the hands of other inmates within the same dormitory.

171.

Defendants were aware of numerous efforts that Mr. Mathis took in an attempt to request to be transferred to another unit or facility because of the threats that Mr. Mathis had learned had been made against his safety and life and the hands of other inmates. Several of the Defendants were also aware that Mr. Mathis' requests to be moved to another location had been denied.

172.

Despite this knowledge, Defendants failed to respond in an objectively reasonable manner to the substantial risk of harm faced by Mr. Mathis, and others housed in the Georgia State Prison's Tier II Program and other segregation units.

173.

For example, none of the Defendants investigated the incident when Mr. Mathis was assaulted and stabbed by an inmate on September 14, 2020.

174.

In response to Mr. Mathis' February 6, 2021 report that he was attempting to leave his assigned dormitory without permission because of the treats to his life, none of the Defendants

investigated Mr. Mathis' claims, took any action to remedy Mr. Mathis' concerns, or took measure to ensure that Mr. Mathis received proper mental health treatment in response.  Instead, Mr. Mathis received a punishment in the form of being moved to the D-West unit, which is known to have deplorable conditions.

175.

After Mr. Mathis made numerous attempts to be transferred out of his assigned dormitory or away from the facility, citing his concern for his safety and life at the hands of other inmates, Defendants not only failed to address Mr. Mathis' concerns, Defendants did not even investigate Mr. Mathis' allegations.

176.

There was an obvious need to ensure that Mr. Mathis was assigned to a dorm and facility that was free from threats to Mr. Mathis' safety and life at the hands of other inmates.  Moreover, Defendants were well-aware of the consequences that could potentially result from the failure to protect an individual within their custody from threats to their safety and life at the hands of other inmates because of the numerous instances of violence and self-harm that had been routinely occurring at the facility at issue at the time.

177.

As alleged herein, as a specific result of said Defendants' failure to take reasonable measures to guarantee the safety of Mr. Mathis and to protect him from violence at the hands of other inmates, Defendants created the conditions under which Mr. Mathis ultimately lost his life.

178.

Pursuant to 42 U.S.C. § 1983, Plaintiff, on behalf of Mr. Mathis, is entitled to all damages available to him as a result of the deliberate indifference to the health and safety of Mr. Mathis

because of the failure to protect Mr. Mathis for which all Defendants were responsible, all in an amount to be proven at trial.

<strong>JURY DEMAND</strong>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

WHEREFORE, Plaintiff Christopher Dewayne Bonner, as Heir to the Estate of Christopher Dewayne Mathis, respectfully prays for the following relief:

1)    The Summons and Process be issued to Defendants and that Defendants be served as provided by law;

2)    That this matter be tried before a jury of twelve;

3)    That there be an initial period of discovery for the purpose of ascertaining the identity of individuals whose actions and conduct have been alleged herein, but whose identities are currently unknown, and to allow Plaintiff to amend his Complaint once such information is ascertained;

4)    That judgment be awarded for and in favor of Plaintiff and against all Defendants on Count I for subjecting Mr. Mathis to Cruel and Unusual Punishment in violation of the Eighth Amendment, and grant Plaintiff all relief allowable pursuant to 42 U.S.C. § 1983.

5)    That judgment be awarded for and in favor of Plaintiff and against Defendants Timothy Ward, Ahmed Holt, Javel Jackson, and Trevonza Bobbitt on Count II for Deliberate Indifference to the Health and Safety of Mr. Mathis through said Defendants' failure to hire, and grant Plaintiff all relief allowable pursuant to 42 U.S.C. § 1983;

6)    That judgment be awarded for and in favor of Plaintiff and against all Defendants on Count III for Deliberate Indifference to the Health and Safety of Mr. Mathis as a result of said

Defendant's Failure to Protect Mr. Mathis, and grant Plaintiff all relief allowable pursuant to 42

U.S.C. § 1983; and,

    7)    For such other and further relief as the Court shall deem just and proper.

Respectfully submitted, this 24th day of February, 2023.


s/ Debra G. Gómez
DEBRA G. GÓMEZ
*To Seek Admission Pro Hac Vice*
Georgia Bar No. 300509
*Attorney for Plaintiff*


GÓMEZ LAW GROUP
P. O. Box 13523
1469 Oglethorpe Street
Macon, Georgia 31208
(478)744-0905
dgomez@gomezlawgroup.com

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
*To Seek Admission Pro Hac Vice*
Georgia Bar No. 142447
*Attorneys for Plaintiff*


COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: (478) 841-9007
Facsimile: (478) 841-9002
keb@cooperbarton.com
mdc@cooperbarton.com